

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
10/09/2015

| | | |
|---|---|---|
| IN RE: | § | |
| **ATP OIL & GAS CORPORATION** | § | **CASE NO: 12-36187** |
| Debtor(s) | § | |
| | § | **CHAPTER  7** |
| | § | |
| **RODNEY  TOW** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 14-3316** |
| | § | |
| **GEMINI INSURANCE COMPANY**, *et al* | § | |
| Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

Plaintiff, Rodney Tow, Chapter 7 Trustee of the Estate of ATP Oil & Gas Corporation, ("Tow") has filed two motions for partial summary judgment seeking declaratory judgment that Underwriters at Lloyd's, London Syndicate #4711 ("Underwriters") and/or Gemini Insurance Company ("Gemini") owe a duty to defend ATP in an underlying lawsuit.  Underwriters' has filed a cross motion for partial summary judgment regarding its duty to defend. Tow's motions are denied. Underwriters' motion is granted.

### Background

ATP was a Texas corporation in the business of acquisition, development, and production of oil and gas. On August 17, 2012, ATP filed a voluntary petition for relief under Chapter 11 of the United State Bankruptcy Code.  On June 26, 2014, the case was converted to a Chapter 7 proceeding, and Tow was appointed Trustee for ATP.

On September 29, 2011, ATP entered into a Master Service Agreement with Greystar Corporation ("MSA").  Greystar is a corporation in the business of supplying personnel and equipment related to hydrocarbon development.  The MSA between ATP and Greystar dictated

the terms under which Greystar would provide equipment and personnel to ATP, as called for by individual work orders issued by ATP.  The MSA required Greystar defend and indemnify ATP and its parent, subsidiary and affiliated companies for claims involving bodily injury to Greystar employees sustained while working for ATP.  The MSA also required Greystar to name ATP and its parent, subsidiary and affiliated companies as additional insureds on its insurance policies.

In October of 2012, Gemini issued an Energy Commercial General Liability Policy to Greystar with a policy period of October 1, 2012 to October 1, 2013.  Gemini issued an Excess Liability Policy to Greystar for the same policy period.

In October of 2012, Underwriters issued ATP a Commercial General Liability Policy with a policy period of October 31, 2012 to October 31, 2013.  Underwriters issued a series of umbrella policies for the same policy period.

In December 2012, Randy Comeaux, an employee of Greystar, worked on a platform owned/or operated by ATP. As a result of work on the platform, Comeaux was injured and filed a personal injury suit against ATP styled *Randy Comeaux v. ATP Oil and Gas Corporation, et al.*; Cause No. 2:13-CV-06584, in the United States District Court for the Eastern District of Louisiana.

Comeaux's complaint alleged that he suffered numerous injuries while working for Greystar on ATP's platform, including injuries to his lumbar spine sustained while trying to escape dangerous and toxic fumes.

ATP tendered Comeaux's lawsuit to Gemini and Underwriters and requested they defend and indemnify it based on the allegations contained in Comeaux's complaint.  Neither Gemini nor Underwriters have agreed to defend or indemnify ATP.

On October 20, 2014, Tow, as Chapter 7 Trustee, filed this adversary proceeding against Gemini and Underwriters.  The complaint sought, *inter alia*, declaratory judgment that Gemini and Underwriters had a duty to defend or indemnify ATP against Comeaux's lawsuit.  Tow filed this motion for partial summary judgment on March 20, 2015, against Gemini and Underwriters requesting this Court rule that Gemini and/or Underwriters have a duty to defend the underlying suit.

In Summary, the Court finds as follows:

1. The MSA was in effect at the time the events giving rise to Comeaux's complaint occurred.

2. Pursuant to the Outer Continental Shelf Lands Act, Louisiana law applies to the MSA.

3. The Louisiana Oilfied Anti-Indemnity Act may invalidate the indemnification provision in the MSA, depending on whether Greystar paid any material part of the costs associated with ATP's coverage.

4. The pollution exclusion contained in the Gemini policy may apply, depending on whether the pollutants allegedly causing injury to Comeaux were on the platform in connection with the ATP's operations.

5. Late notice, if any, does not affect Gemini's duty to defend.

6. The events giving rise to Comeaux's complaint fall within the Underwriters policy's pollution exclusion.  Accordingly, Underwriters does not have a duty to defend the suit.

## Jurisdiction and Authority

At a minimum, this Court possesses "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b).  The Fifth Circuit has held that "it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under,' or 'related to a case under' title 11."  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).  The Fifth Circuit noted that § 1334(b)'s language operates "conjunctively to define the scope of jurisdiction." *Id.* Consequently, bankruptcy courts

need only "determine whether a matter is at least 'related to' the bankruptcy." *Bass v. Denney (In re Bass),* 171 F.3d 1016, 1022 (5th Cir. 1999) (citing *Walker v. Cadle Co. (In re Walker),* 51 F.3d 562, 569 (5th Cir. 1995)); *In re Wood,* 825 F.2d at 93.

Although subject matter jurisdiction is proper in this Court, questions regarding the constitutional authority of an Article I bankruptcy judge must also be addressed.  Under *Stern v. Marshall*, the question of whether a bankruptcy court may enter final judgment in a case depends on whether the cause of action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.  131 S.Ct. 2594, 2618 (2011).  This adversary proceeding contains state law claims and non-bankruptcy federal claims which would not necessarily be resolved in the claims allowance process.  However, the Supreme Court recently held that parties may consent to the bankruptcy court's adjudication of a so-called *Stern* claim without implicating Article III issues "when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." *Wellness Int'l Network v. Sharif*, 135 S.Ct. 1932, 1939 (2015).

Tow has consented to adjudication by this Court.  (ECF No. 1 at 2).  Neither Gemini nor Underwriters have affirmatively consented to adjudication.

This Court may issue interlocutory orders, even in proceedings in which the Court does not have authority to issue a final judgment.  *In re Shelton*, 2014 WL 1576864 (Bankr. S.D. Tex. Apr. 18, 2014).

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *City & Cnty. of S. F., Cal. v. Sheehan*, 135 S.Ct, 1765, 1769 (2015). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[1] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Moreover, the Court is not bound to

---

[1] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for the purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

search the record for the non-moving party's evidence of material issues. *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322-24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact. If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 325. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Id.* at 324. The motion should be granted only if the nonmovant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

**Analysis**

Texas courts follow the eight corners rule to determine whether an insurer owes a duty to defend.  Under this rule, courts look to the facts alleged within the four corners of the pleadings, and measure them against the language contained within the four corners of the insurance policy. *Evanston Ins. Co. v. Legacy Life, Inc.*, 370 S.W.3d 377, 380 (Tex. 2012).  If a complaint potentially includes a claim covered by the policy, the insurer must defend the entire suit.  *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008).  If the insured proves coverage, the insurer must prove the claim falls within an exclusion.  *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).  Intent to exclude coverage must be expressed in clear and unambiguous language.  *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008).  If the insurer proves that a policy exclusion is applicable, the burden returns to the insured to show than an exception to the exclusion brings the claim back within coverage.  *Gilbert*, 327 S.W.3d at 124.  If a term in an insurance policy is susceptible to more than one reasonable interpretation, the uncertainty must be resolved in favor of the insured.  *Legacy Life*, 370 S.W.3d 377 at 380.

**Greystar's Duty to Defend**

    *1.*     *The MSA Was in Effect during the Policy Period*

The insurance policy Gemini issued to Greystar allowed Greystar to include additional insured parties under the policy for liability arising out of Greystar's operations or liability arising out of premises owned by Greystar.  (ECF No. 33-3 at 12).  The policy requires that a written agreement exist between Greystar and any additional insured party and the agreement be in effect during the policy period, executed before the events giving rise to the claim occur. (*Id.*).  The MSA between ATP and Greystar reflects the written agreement required by the

Gemini policy.  The MSA also contains Greystar's obligation to defend and indemnify ATP and procure and maintain sufficient insurance to facilitate such defense and indemnification.  (ECF No. 33-2 at 16, 20).

Gemini relies on § 365 of the Bankruptcy Code to support its argument that the MSA was not in effect during the policy period, and consequently, ATP is not an additional insured under the policy.  (ECF No. 24 at 7).  Gemini arrives at this result by concluding that the MSA is an executory contract, deemed rejected under § 365(d)(1) by virtue of Tow allowing 60 days to elapse following conversion to chapter 7 without affirmatively assuming or rejecting the MSA.  Under § 365(g), a deemed rejection operates as a breach of contract.  Under § 365(g)(1), the breach is effective immediately before the date of filing the petition, in this case, August 17, 2012. (ECF No. 24 at 7).

Tow contends that ATP assumed and assigned the MSA as part of an approved asset sale while in chapter 11, and consequently, the MSA is still in effect.  The Court finds no record of this. (Case No. 12-36187, ECF No. 2706-1).[2]

Central to Gemini's argument is the assumption that the MSA is an executory contract, susceptible to assumption or rejection under § 365.  Because the MSA is not an executory contract,  § 365 does not apply.  While the Code does not define "executory contract," the Fifth Circuit applying § 365 has stated, "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994) (citing Professor Vern Countryman, *Executory*

---

[2] Tow states the MSA was part of an Order issued by this Court approving sale of certain assets.  In the asset purchase agreement there is no reference to the MSA in the section titled "Assigned Contracts." The only reference to Greystar in the purchase agreement is in the disclosure schedules and relates to leases.  (Case No. 12-36187 ECF No. 2706-1 at 195, 97, 98).

*Contracts in Bankruptcy: Part I*, 5 Minn. L. Rev. 439, 458-62 (1973), and *Executory Contracts in Bankruptcy: Part II*, 57 Minn. L. Rev. 479 (1974)).

The MSA between ATP and Greystar does not require performance by either party. Rather, it sets forth an agreement to comply with the terms of the MSA *if* the parties enter into contracts in the future.  (ECF No. 33-2 at 2) ("[ATP] and [Greystar] enter into this Agreement, which shall be the basis and controlling contract document governing all work or services performed by Greystar for ATP during the term hereof . . . .").  The MSA states that it does not obligate ATP to request work or services from Greystar, nor does it obligate Greystar to accept such work if offered.  (*Id.* at 5).  The purpose of the MSA is to supply terms to future contracts anticipated by ATP and Greystar.  "A master service agreement is not an executory contract . . . . An executory contract is an agreement to do something in the future.  A master service agreement is an agreement to abide by certain terms *if* the parties agree to do something in the future." *Moser v. Aminoil U.S.A., Inc.*, 618 F. Supp. 774, 779 (W.D. La. 1985).

The MSA did not obligate either party to do anything independent of an accompanying work order.  Because no performance was due under the MSA, it was not an executory contract subject to deemed rejection under § 365.  Accordingly, the MSA applied at the time the events giving rise to the claim occurred.

2.    *Louisiana Law Applies to Interpret the MSA*

Tow does not indicate what substantive law should be applied to interpret the provisions of the MSA.  Gemini argues, pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), it is the substantive law of the state of Louisiana that should control interpretation of the MSA.  43 U.S.C. § 1331, et seq.  Gemini further argues that the Louisiana Oilfield Anti-Indemnity Act ("LOAIA") invalidates the contractual indemnity and additional insured terms in the MSA.  Tow

does not dispute the possible applicability of Louisiana law, but maintains that even if it does apply, the LOAIA does not affect the validity of the terms in the MSA. (ECF No. 36 at 13).

The choice of law provision in the MSA states that general maritime law should apply. (ECF No. 33-2 at 29).  However, if OCSLA applies to the contract, its choice of law principles supersede any contractual choice of law provision.  *Union Tex. Petroleum Corp. v. PLT Eng'g Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990).  OCSLA states, "[t]he subsoil and seabed of the outer Continental Shelf appertain to the United States are subject to its jurisdiction, control, and power of disposition as provided in [the Outer Continental Shelf Lands Act]." The parties do not dispute that Comeaux was allegedly injured while working on the Outer Continental Shelf adjacent to the state of Louisiana.  (ECF No. 24 at 8).  To determine whether maritime law or the substantive law of the state of Louisiana should be applied, the Court must look to the choice of law provisions in OCSLA.  The Fifth Circuit has articulated three conditions which, if met, indicate adjacent state law should be applied as surrogate federal law: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto).  (2) Federal maritime law must not apply of its own force.  (3) The state law must not be inconsistent with Federal law." *PLT*, 895 F.2d at 1047.

To determine whether a controversy arose on a situs covered by OCSLA in a contractual indemnity dispute, the Court must look to where the majority of the performance called for under the contract is to be performed.  *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 (5th Cir. 2009).  If it is to be performed on a stationary platform or other OCSLA situs enumerated in 43 U.S.C. § 1333(a)(2)(A), then the first condition would be met.  *Id.*  As discussed previously, the MSA does not contemplate performance independent of a separate work order.  Where a "contract consists of two parts, a blanket contract followed by later work

orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions." *Davis & Sons v. Gulf Oil Corp.*, 919 F.2d 313, 315-17 (5th Cir. 1990).  Courts should ordinarily look to the work order to determine where the work is to be performed rather than the blanket contract.  *Grand Isle*, 589 F.3d at 787 n.6.

Tow does not object to Gemini's reference to the applicable work order or deposition of Comeaux in the underlying suit to the extent it bears on the location of the platform and the nature of the operations performed there.  (ECF No. 35 at 4).  The work order indicates that Greystar supplied personnel to shelf and deepwater locations.  (ECF No. 24-4 at 45).  In a deposition, Comeaux states that he was hired by Greystar as Lead Operator on the Titan for ATP, and the Titan was a "producing drilling mini dock." (*Id.* at 58, 71).  In the underlying case, Tow admitted that the platform on which Comeaux was allegedly injured was attached to the seabed of the Outer Continental Shelf adjacent to the state of Louisiana.  (*Id.* at 33).  This evidence is sufficient to find the first condition outlined in *PLT* satisfied.

The second condition of the *PLT* test—whether maritime law applies of its own force— "depends . . . on the nature and character of the contract, rather than on its place of execution or performance." *Davis*, 919 F.2d 313, 316 (5th Cir. 1990).  The Fifth Circuit set forth six factors to consider when determining whether a contract is maritime in nature and character. However, courts have consistently held contracts related to providing services to fixed oil and gas platform are non-maritime in nature.  *See e.g., In re Seahawk Drilling, Inc.*, 2012 WL 1123864  at *3 (Bankr. S.D. Tex. Mar. 30, 2012); *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 956-57 (5th Cir. 1988).  Because MSA and accompanying work order contemplate Greystar supplying

personnel to ATP for the purpose of hydrocarbon development, it is not maritime in nature. (ECF No. 33-2 at 3).

The third condition of *PLT* test is also satisfied. It is well settled that the state law at issue, the Louisiana Oilfield Anti-Indemnity Act, is not inconsistent with any federal statute. 589 F.3d at 789.

All conditions of the *PLT* test are met, and accordingly, the substantive law of the state of Louisiana applies to interpret the provisions of the MSA.

>   3.     *The LOAIA May Invalidate the Indemnity and Additional Insured Provision in the MSA*

The LOAIA invalidates indemnification clauses in contracts pertaining to oil and gas wells to the extent they require defense or indemnity where there is negligence or fault on the part of the indemnitee.  La. Stat. Ann. § 9:2780.  The determination whether a defense is due must be made at the start of litigation, based solely on the relevant pleadings and contractual provisions.  *Knapp v. Chevron USA, Inc.*, 781 F.2d 1123, 1131-32 (5th Cir. 1986).  There is one settled exception to the rule invalidating indemnification agreements.  Indemnification clauses are not invalidated if the indemnitee pays the premiums for the insurance coverage at issue. *Marcel v. Placid Oil Company*, 11 F.3d 563 (5th Cir. 1994).  This exception does not apply if "*any material part* of the cost of insuring the indemnitee is borne by the independent contractor procuring the insurance coverage." *Id.* at 570 (emphasis added).

Tow argues, and the Court agrees, that if ATP paid all premiums associated with the insurance policy Gemini provided Greystar to cover Comeaux's work, and Greystar did not pay any material part of the cost of that policy, this case would fall within the *Marcel* exception and the indemnification clause would be upheld.  Conversely, if Greystar bore any material part of

the cost of the policy covering Comeaux, the indemnification clause in the MSA would be rendered invalid.

In support of its assertion that ATP paid the premiums on the policy covering Comeaux's work, Tow submits an affidavit of Linda Metcalf, a producer with Tom Baker Insurance Agency, Inc. involved in handling Greystar's account in 2012.  Attached to the affidavit is an invoice sent to ATP for the additional insured premium for the policies issued to Greystar, and a record indicating payment of the invoice.  (ECF No. 36-1).  The invoice was in the amount of $2,000, $1,000 for each policy, effective from 10/01/2012 to 10/01/2013. The record of payment indicates that the entire amount was paid.[3]

Additionally, the MSA appears to be drafted specifically to avoid the invalidation of the indemnification provision.   It states, "[Greystar] shall not bear or pay any material cost associated with [ATP's] coverage under the insurance provided by [Greystar]." (ECF No. 33-2 at 21).

However, the mere fact that $2,000 was paid by ATP on an invoice indicating it was in satisfaction of "additional insured endorsements" does not preclude the possibility that Greystar was responsible for any material part of the policy cost.  Indeed, Greystar provides evidence that premiums on the policy it had with Gemini exceeded $500,000 in exchange for $12 million in coverage.  (ECF No. 40 at 7); *See Amoco Prod. Co. v. Lexington Ins. Co.*, 745 So. 2d 676 (La. App. 1 Cir. 1999) (finding $2,000 paid for over $11 million in liability coverage did not satisfy the movant's burden to prove that no material part of the costs was borne by the contractor).  In *Rogers v. Samedan Oil Corp.*, the Fifth Circuit distinguished *Amoco* and affirmed the trial

---

[3] The affidavit of Linda Metcalf indicates the invoice and record of payment were kept in the ordinary course of business and it was regular business practice to make such records.  The invoice billing date was October 12, 2012, and a notation indicates payment was received on October 26, 2012.  These dates suggest the record was made at or near the time of the event.  The Court is satisfied that these records meet the business records exception to the rule against hearsay.  Fed. R. Evid. 803(6).

court's grant of summary judgment where the premium paid appeared nominal and out of proportion with the coverage. In *Rogers*, the Court found it significant that the insurance policy specified the amount of premium owed by indemnified parties. *Rogers*, 308 F.3d 477, 482 (5th Cir. 2002) ("Lexington set the premium for the endorsements naming Samedan as an addition insured, and Samedan established that it paid the entire amount of the premium demanded by Lexington for that coverage."). *Rogers* is distinguishable on these facts because the Gemini policy at issue in this case does not establish the amount of premiums owed by additional insured parties on the policy. The fact that $2,000 was paid does not satisfy Tow's burden of proving that Greystar bore no material part of the cost.

Furthermore, the MSA provision drafted in obvious recognition of the effect of Louisiana law does not, by itself, provide the Court assurance that it was followed. Though the provision evidences the parties' intent to fall within the *Marcel* exception, intent is insufficient. It is the behavior of the parties that is crucial to determining whether the *Marcel* exception applies.

Accordingly, a fact issue remains as to whether ATP's payment of $2,000 toward insurance premiums left Greystar bearing any material part of the cost.

### 4.   *The Pollution Exclusion May Apply*

The MSA was in effect during the policy period, but a fact issue remains regarding the validity of the indemnification provision in the MSA. For the purpose of completeness, the Court will continue the analysis *as if* the indemnification provision is not rendered invalid by Louisiana law to determine whether Gemini has a duty to defend based on the policy and associated coverage exclusions. The pollution coverage exclusion is particularly relevant in this case. Although Louisiana law applies to the MSA, the parties agree Texas law applies to

interpret the Gemini policy.  (ECF No. 17 at 10-17; ECF No. 24 at 17-23); Tex. Ins. Code §

21.42.  The Gemini policy's pollution exclusion clause excludes coverage, in pertinent part, for:

> 13.  Pollution:
>
> a.      Bodily Injury or Property Damage arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of Pollutants:
>
>> (1)      At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any Insured. However, this Subparagraph (1) does not apply to:
>>
>>> (i)         …
>>>
>>> (ii)      Bodily Injury or Property Damage for which You may be held liable, if You are a contractor and the owner or lessee of such premises, site, or location has been added to Your policy as an Additional Insured with respect to Your ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any Insured, other than that Additional Insured.
>>
>> (4)      At or from any premises, site or location on which any Insured or any contractors or subcontractors working directly or indirectly on any Insured's behalf are performing operations if the Pollutants are brought on or to the premises, site, or location in connection with such operations by such Insured, contractor, or subcontractor . . . .

(ECF No. 33-3 at 24).

Tow first argues the pollution exclusion does not apply because the alleged injury

suffered by Comeaux did not arise out of or result from the "actual, alleged, or threatened

discharge . . . of pollutants," as required by subparagraph (a).  (ECF No. 36 at 16).  Tow reasons

that because the alleged injury suffered by Comeaux was not caused by the hazardous nature of

the material, common sense dictates the pollution exclusion should not apply.  (*Id.*).

However, this argument ignores the purpose of the term "threatened discharge" in

subparagraph (a).  According to the language of the contract, an injury may arise out of or result

from the threatened discharge of pollutants.   Such an injury would not be caused by the hazardous nature of the pollutants as no actual exposure to the pollutants would occur.   This language appears to include Comeaux's alleged injury, where he claims he was injured not only by exposure to pollutants, but also while seeking to escape them.  (ECF 25-1 at 3).

Furthermore, under Texas law, the phrase "arising out of" requires nothing more than but-for causation.  *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004).  The parties do not dispute that Comeaux's alleged injury was the result of his reaction to toxic fumes.   Accordingly, the injuries alleged by Comeaux satisfy the "arises out of" requirement of the pollution exclusion.

The Pollution Exclusion's applicability to bodily injury or property damage arises in six circumstances.  (ECF. No. 33-3 at 24-25).  The parties only dispute the applicability of two of them, subparagraphs (1) and (4), reproduced above.

With respect to subparagraph (1), Tow argues that it does not apply because Comeaux did not allege that either ATP or Greystar "occupied" the platform on which Comeaux was allegedly injured.  (ECF No. 17 at 16).  Tow correctly states that under Texas law, the word "occupied" means continued presence and control over the premises.  *Liberty Mut. Fire Ins. Co. v. Lexington Ins. Co.*, 446 S.W.3d 835, 843 (Tex. App.—San Antonio 2014, no pet.) ("[W]e hold that occupy comprises (1) a continued physical presence on the premises, and (2) control of the premises for the insured's own benefit.").  Tow concludes that because Comeaux's amended complaint identifies "ATP Oil & Gas and/or ATP Titan LLC" as the owner/operator of the platform, the disjunctive functions to allow for the possibility that ATP Titan LLC occupied the platform, and consequently, no entity qualifying as "any insured" under the policy (ATP or Greystar) occupied the platform.  (ECF No. 17 at 16).

This argument is only successful if ATP Titan LLC is not an additional insured under the policy. However, the MSA is clear that Greystar must indemnify and procure insurance for the "Company Group." (ECF No. 33-2 at 16, 20-21). The "Company Group" is defined in the MSA as the Company (ATP Oil & Gas Corporation), as well as its subsidiaries. (ECF No. 33-2 at 2). SEC filings indicate ATP Titan LLC is a wholly owned subsidiary of ATP Oil & Gas Corp. (ECF No. 24-4 at 8).[4] Therefore, ATP Titan LLC is part of the Company Group for whom the benefit of a valid indemnification clause would run, and also qualifies as an additional insured under the Gemini policy. Accordingly, there is no doubt that "any insured" occupied the platform at the time the alleged injury occurred.

It appears then, that subparagraph (1) of the Pollution Exclusion applies. However, there is an exception to the Pollution Exclusion and subparagraph (1) does not apply if subparagraph (ii) is satisfied. Under Texas law, once an insurer demonstrates that a policy exclusion applies, the burden falls on the insured to prove that an exception to an exclusion is triggered. *Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998). The Summary Judgment record makes clear that subparagraph (ii) is satisfied and, consequently, the pollution exclusion in subparagraph (1) does not apply.

The exception to exclusion states that Subparagraph (1) does not apply to "Bodily Injury or Property Damage for which You may be held liable if You are a contractor and the owner or lessee of such premises . . . has been added to Your policy as an Additional Insured . . . ." Under the policy, the term "You" refers specifically to the Named Insured, Greystar. (ECF No. 33-3 at

---

[4] The Court's consideration of the MSA and SEC filings to determine whether ATP Titan LLC qualifies as an additional insured does not violate the eight-corners rule because it goes solely to a fundamental issue of coverage. *ACE Am. Ins. Co. v. Freeport Welding & Fab., Inc.*, 699 F.3d 832, 840-41 (5th Cir. 2012) ("If we determine that Freeport qualifies as an additional insured during the relevant time period, our analysis will then proceed to the eight-corners rule . . . .").

38, 8).  Greystar argues that because it is not a named defendant in Comeaux's lawsuit, it may not be held liable as required by the exclusion exception in subparagraph (ii).  (ECF No. 24 at 22).  Tow contends the phrase "may be held liable" is not so restrictive as to require Greystar to be a named defendant in the underlying suit.  (ECF No. 36 at 17).  Instead, Greystar may be held liable by virtue of the indemnification clause in the MSA on the occasion ATP or ATP Titan is found liable in the underlying suit.  (*Id.*).  The Court agrees that Greystar's interpretation is incorrect.  The exclusion exception could have stated with a great deal more clarity that it applied only if Greystar was a named defendant, if indeed that was the parties' intent.  Because Greystar *may* be held liable by virtue of the indemnification provision in the MSA, and because ATP has been added to the policy as an additional insured, this exclusion exception applies.[5]

        The final pollution exclusion Greystar believes applies is contained in subparagraph (4). Tow argues that subparagraph (4) does not apply because Comeaux did not allege in the complaint what entity brought the pollutants onto the platform.  (ECF No. 36 at 18).  Tow emphasizes that it is the question of *who* brought the pollutants onto the platform that is controlling.  (*Id.*).  The Court cannot accept Tow's interpretation of the policy.  The exclusion applies "if the pollutants are brought on or to the premises, site, or location *in connection with such operations* by such insured, contractor, or subcontractor." (ECF No. 33-3 at 24) (emphasis added).  Tow's interpretation entirely ignores the phrase "in connection with such operations."

        The phrase "by such insured" modifies the term "operations." It does not also modify the phrase "brought on or to the premises." If a comma preceded the phrase "by such insured," Tow's argument would be more compelling.[6] However, no such comma exists.  The question is

---

[5] Of course, if Tow fails to prove ATP paid the cost of coverage, the indemnification clause will be invalidated by operation of the LOAIA and this exception will not apply.
[6] "Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." Terri LeClercq,

whether the pollutants were brought on the premises in connection with such operations by the insured.  *See Clarendon Am. Ins. Co. v. Bay, Inc.*, 10 F. Supp. 2d 736, 748 (S.D. Tex. 1998) (barring insurance coverage under identical policy language where "pollutants were brought on or to the work premises in connection with operations done on behalf of [the insured]").  Tow has not offered any evidence demonstrating that the pollutants giving rise to the alleged injury were not on the platform in connection with the insured's operations.  The parties have not asserted, and the Court takes no position on, the possible exceptions to exclusion applicable under subparagraph (4).  (ECF No. 33-3 at 24-25).

Giving proper effect to the language of the policy, a fact question remains as to whether the pollutants were brought onto the platform in connection with an insured's operations.

### 5.    *Late Notice Does Not Affect Gemini's Duty to Defend*

In Gemini's initial response to Tow's Motion for Summary Judgment, Gemini argues ATP failed to provide it with timely notice of its claim.  Gemini did not indicate what effect a failure to give timely notice would have on the validity of Tow's claim or Gemini's duty to defend.

Under Texas law, failure to give timely notice does not void coverage under an insurance policy unless the insurer can demonstrate that it was prejudiced.  *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636-37 (Tex. 2008).  Gemini has demonstrated no such prejudice.  Comeaux filed the underlying lawsuit on December 5, 2013.  (ECF No. 17 at 3).  Gemini was provided notice of the lawsuit on August 22, 2014.  (ECF No. 36 at 20).  ATP retained counsel and defended the lawsuit since the time it was served.  (*Id.*).  Though the notice of suit was delivered approximately eight months after filing, no oral discovery has taken place, no dispositive

---

*Doctrine of the Last Antecedent: The Mystifying Morass of Ambiguous Modifiers*, Tex. J. Bus. L. 199, 205 (Fall 2004).

motions have been filed, and no settlement discussions have occurred.   (ECF No. 36 at 20).
Additionally, Gemini has not actually asserted it was prejudiced by untimely notice.
Accordingly, to the extent ATP failed to provide Gemini timely notice, it has no effect on
Gemini's potential duty to defend the underlying suit.

**Underwriters' Duty to Defend**

There is no dispute that ATP is an insured under the Underwriters' policy, or that the
allegations contained in Comeaux's complaint constitute an occurrence under the policy within
the policy period.   The only issue requiring resolution concerning Underwriters' duty to defend
is whether the pollution exclusion contained in the insurance policy applies to the facts alleged in
Comeaux's complaint.   The Underwriters policy's pollution exclusion clause states, in pertinent
part:

> This insurance does not apply to any actual or alleged liability directly or
> indirectly caused by or arising out of seepage, pollution or contamination however
> caused whenever or wherever happening.

Tow relies in part on *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, a
Seventh Circuit case that expresses concern with the potentially boundless applicability of
certain pollution exclusion clauses.   *Pipefitters*, 976 F.2d 1037, 1043 (7th Cir. 2002) ("Without
some limiting principle, the pollution exclusion clause would extend far beyond its intended
scope, and lead to some absurd results.").   Specifically, the Seventh Circuit articulated a scenario
in which a person slips and falls on the spilled contents of a bottle of Drano, noting that although
Drano is a contaminant that can potentially lead to bodily injury, these events would not typically
be characterized as pollution.   *Id.*   The Fifth Circuit has acknowledged and, at least to some
extent, agreed with the Seventh Circuit's common-sense approach to addressing the potentially
overbroad effect of pollution exclusion clauses.   *Certain Underwriters at Lloyd's London v. C.A.*

*Turner Const. Co.*, 112 F.3d 184, 188 (5th Cir. 1997) ("[w]e appreciate the difficulty inherent in defining the scope of a pollution exclusion clause when the damage-causing incident involves a commonly used chemical or when only a slight amount of substance is released.").

In *C.A. Turner*, a worker was welding pipe while standing on scaffolding shrouded in plastic tarp to protect from rain. *Id.* at 185. At some point, rags that were stuffed into the pipe to prevent chemical leakage were removed and either the rags or chemicals in the pipe made contact with the hot, recently welded pipe. *Id.* The chemical contact with the heat of the pipe resulted in a cloud of phenol gas formed inside the plastic-wrapped scaffolding. *Id.* The worker dived toward the entrance of the scaffolding to escape the gas and suffered injuries through inhalation of the gas and the fall. *Id.*

Giving consideration to the concerns articulated by the Seventh Circuit in *Pipefitters*, the Fifth Circuit ultimately decided that the worker's injuries fell within the pollution exclusion. *Id.* at 188 ("[w]e do not believe that our conclusion offends [the Seventh Circuit's] approach in view of the substantial nature of the discharge that occurred here.").

There are obvious similarities between *C.A. Turner* and the case at bar, both in terms of the facts and the language of the pollution exclusion clauses. Comeaux alleged he was exposed to "crude oil, methonal, LDH 43, paraffin inhibitor, asphaltine inhibitor, defoamer, and calcium bromide." (ECF No. 25-1 at 3). As a result of this exposure, he alleged injuries caused by contact with the chemicals and injuries to his lumbar spine while "seeking to escape the dangerous and toxic fumes . . . ." (*Id.*). The pollution exclusion clause in *C.A. Turner* was similar to the Underwriters' exclusion, and applied to "bodily and/or personal injury . . . directly or indirectly caused by or arising out of . . . pollution and/or contamination . . . whenever

occurring. *C.A. Turner*, at 186. Texas law was applied to interpret the policy in *C.A. Turner*, and is equally applicable in the instant case.

The term "pollution" is not defined in the policy.[7]  Undefined terms in insurance policies are given their commonly understood or generally accepted meaning. *Lamar Homes*, 242 S.W.3d 1, 8 (Tex. 2007).  Pollution has been defined as "[c]ontamination of air . . . by the discharge of harmful substances." *Webster's II New Riverside University Dictionary* 911 (1984). In *C.A. Turner* the Fifth Circuit was also presented with the term pollution in the policy, and using the same definition, found "the phenol gas emission constituted bodily-injuring pollution or contamination . . ." and coverage for the claim was precluded by the pollution exclusion clause. *C.A. Turner*, at 189. Comeaux's complaint alleges the discharge of a variety of harmful substances in the form of dangerous and toxic fumes. (ECF 25-1 at 3). He states that he suffered injuries as a result of exposure to these fumes, and injuries to his back sustained while seeking to escape the fumes. (*Id.*). These fumes qualify as contamination of the air by discharge of harmful substances, and are therefore pollution for the purposes of the policy exclusion. Accordingly, Underwriters does not have a duty to defend Comeaux's lawsuit and Underwriters' Cross-Motion for Partial Summary Judgement is granted.

---

[7] Tow requests the Court find that the Underwriters policy's modified pollution exclusion is intended to be narrower than the pollution exclusion contained in Underwriters' standard commercial general liability policy. (ECF No. 25-3 at 19, 41). Specifically, Tow argues the term "pollution" as used in the modified exclusion, is narrower than the term "pollutants" used in the standard pollution exclusion clause. (ECF No. 16 at 11-12). The Court need not make this determination because the events alleged in the complaint satisfy the language of the modified pollution exclusion.

**Conclusion**

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **October 9, 2015.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE
